UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------

BARRINGTON WOOLCOCK,                    10-cv-1967 (ARR)

        Petitioner,

   -against-

PEOPLE,

        Respondent.

------------------------------------------------------------------ X

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 2 1 2012 ★

BROOKLYN OFFICE

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

On April 13, 2011, Barrington Woolcock ("petitioner"), appearing pro se, filed a petition for a writ of habeas corpus challenging his criminal conviction pursuant to 28 U.S.C. § 2254.[1] Woolcock claims that: (1) there was insufficient evidence to support his conviction; (2) he was denied due process through the prosecutor's improper questioning, summation, and conduct during trial; and (3) his trial attorney rendered ineffective assistance by failing to object properly to the prosecutor's errors, and by making a grossly inappropriate remark that prejudiced the trial judge against petitioner. For the reasons stated below, the petition is denied.

## I. BACKGROUND

On February 22, 2009, Woolcock was convicted in the Supreme Court of the State of New York, Kings County, of Manslaughter in the First Degree in violation of New York Penal Law § 125.20. See People v. Woolcock, 886 N.Y.S.2d 359, 359 (N.Y. App. Div. 2009). A jury found that Woolcock shot and killed Curtis Cummings on October 4, 2003, following an earlier physical confrontation between the two on September 4, 2003. The key issue at trial involved

---

[1] The petition is dated April 13, 2011 on the signature block but was not filed until April 18, 2011. Dkt. #1, at 1, 5.

the shooter's identity, and the government relied primarily on the testimony of a single eyewitness, Kenroy Charles, to prove that Woolcock was the perpetrator.

## A.     The September 22, 2003 Confrontation

Woolcock was a marijuana user in the fall of 2003.  Trial Tr. ("Tr.") at 522.  In August or September that year, he purchased marijuana from Cummings for the first and only time.  Id. at 522-23.  On September 22, 2003, Woolcock attempted to purchase marijuana from Cummings for a second time.  Id. at 524.  That morning, Cummings and his friend, Kendrick Marcus, were sweeping an area on Nostrand Avenue between St. John and Sterling Place.  Id. at 73-76.  Woolcock approached Cummings and tried to buy some marijuana for three dollars.  Id. at 77, 526.  Cummings replied, "I don't sell 3-dollar weed," and then started to "act up."  Id.  Cummings insulted and cursed at Woolcock, and the two men began arguing.  Id. 328-29.  According to Woolcock, Cummings proceeded to take off his gloves and "mov[e] all hostile like," as though he wanted to fight.  Id. at 526.  Acting upon his "[n]atural instinct," Woolcock picked up an iron pipe and swung at Cummings a couple of times.  Id. at 80-81, 526.  The pipe struck Cummings, who fell to the ground.  Id. at 82.

The two men continued fighting, and a police officer approached.  Id. at 43, 82, 526-27.  The officer, John Jimenez, observed "two men arguing" and noted that "one had a very large pipe in his hand."  Id. at 43.  As Jimenez came closer, Woolcock put the pipe down.  Id.  According to Woolcock, Cummings then grabbed the pipe and tried to swing it at Woolcock and Jimenez.  Id. at 527.  Jimenez called for assistance, and other officers arrived.  Id. at 44.

Subsequently, Officer Anthony Andreone arrested both Woolcock and Cummings.  Id. at 45, 56.  Cummings was arrested for disorderly conduct, issued a summons to appear in court, and released a few hours later.  Id. at 56-57.  Woolcock, in turn, was arrested for assault.  Id. at 57-

2

58. As Andreone testified, Cummings "was the one who received the greater injuries, and at the time it looked like he was the one that was assaulted." Id. at 65. Woolcock spent three days in jail, and a judge issued an order of protection requiring that he stay away from Cummings. Id. at 528. On cross-examination, Woolcock acknowledged that he was "pretty upset" about the incident. Id. at 567.

Although Woolcock knew that Cummings "[hung] out on Nostrand Avenue, between St. Johns and Sterling and sometimes between Sterling and Park," he nevertheless returned to that area after being released from jail. Id. at 554-55. As Woolcock explained at trial, he did so because he worked and attended church there. Id. Specifically, Woolcock performed "odd jobs" at a restaurant on Park Place between Nostrand Avenue and Rogers Avenue. Id. at 518-19. He also attended, helped to maintain, and made artwork at a Rostafarian church on Nostrand Avenue between Park Place and Sterling. Id. at 520-21. In addition, because Woolcock was homeless at the time, id. at 60, and "didn't really have a steady place to live," id. at 522, he sometimes spent the night at the church when he was not sleeping at a local shelter, id. at 544. Furthermore, as the church was right around the corner from the restaurant where he worked, Woolcock frequently went back and forth between the two. Id. at 522. Between his release from jail and October 4, 2003, Woolcock encountered Cummings two additional times in the Nostrand Avenue area. Id. at 528-29. However, the men did not interact on those two occasions. Id.

**B.     The October 4, 2003 Confrontation**

Woolcock encountered Cummings once more on October 4, 2003. Id. at 529. While Woolcock was standing in front of the church between 8:00 and 9:00 A.M., Cummings, who was sweeping nearby, began cursing at him and telling him that he "better get the F out of this neighborhood." Id. at 332-33, 529, 557. Charles, who was half a block away, testified that

3

Woolcock and Cummings then got into another verbal argument concerning Woolcock's attempt
to buy marijuana from Cummings for three dollars. Id. at 335, 394. Subsequently, Woolcock
left the area. Id. at 395. By going to Prospect Park, Woolcock testified, he complied with the
court's protection order to stay away from Cummings. Id. at 530. Woolcock also asserted that
he did not return to the area until the next day, when he came back to pick up his belongings
from the church. Id. at 530, 531.

1.    **Testimony of Kenroy Charles**

In contrast, Charles testified that Woolcock returned later that day and killed Cummings.
According to Charles, he, Cummings, and another friend called Bless were having a conversation
on Nostrand Avenue later that morning. Id. at 338. Between 10:30 and 11:30 A.M., Charles was
facing Cummings and Bless when he saw Woolcock approaching from about twenty-three feet
away. Id. at 341, 395, 399. Charles asserted that nothing obstructed his view of Woolcock's
face. Id. at 342. Woolcock proceeded to walk up to Charles, id. at 343, who was then able to see
him "clearly," id. at 344. Charles testified that he next saw Woolcock reach into his pocket and
pull out a gun. Id. At that point, Cummings grabbed Charles, held Charles in front of him as a
shield, and thrust Charles toward Woolcock. Id. at 344-45, 405. As a result, Charles came
within a foot of Woolcock. Id. at 427. While facing Charles, Woolcock reached over Charles's
left shoulder, pointed the gun at Cummings, and fired a shot. Id. at 349, 406-09.

"Everything happened quick," and Charles fell to the ground. Id. at 407, 409.
Thereafter, he saw Cummings running away and Woolcock "crank[ing] the gun again." Id. at
349. By then, Charles was laying on the ground next to Woolcock and trying to crawl under a
van. Id. at 350. After the gun failed to go off again, Woolcock ran around the corner, id. at 349-
50. Although Charles and a friend named Mark decided to chase Woolcock and followed him

4

into a building, they were ultimately unable to find him.[2] Id. at 350-52.

### 2.      Testimony of Monica Joseph

Monica Joseph ("Joseph") owned a store on Nostrand Avenue near Sterling. Id. at 135,
146. She was familiar with Cummings, who used to sweep in front of her store. Id. at 138. On
October 4, 2003, Joseph was in her store between 11:00 and 11:30 A.M. Id. at 141. While
assisting a customer, she glanced outside the store and she saw a tall, black man walk toward
Cummings.[3] Id. at 142-43, 149-50. Joseph testified that the man was wearing a Rastafarian hat,
id. at 142, a type of hat that Woolcock sometimes wore, id. at 568. In addition, Joseph thought
she saw a silver gun in the man's hand. Id. at 143-44, 155. Seconds later, she heard one or two
gunshots and bent down. Id. at 142, 144. When Joseph got back up, she saw Cummings running
but no longer saw the man with the Rastafarian hat. Id. at 145.

Subsequently, in 2005, Woolcock's attorneys at the time approached Joseph. Id. at 158.
They showed her a single photograph of Woolcock and asked whether the person in that
photograph was the man who had shot Cummings. Id. at 159, 458. Joseph responded that she
did not think that the man in the photograph had shot Cummings. Id. at 159. However, Joseph
also testified at trial that she did not get a good look at the shooter's face and did not believe that
she could identify him. Id. at 159-60.

### C.      The Investigation and Arrest

### 1.      Identification by Charles

Charles did not immediately approach the police with information concerning the murder.
Id. at 352. At trial, he explained that he initially "didn't want to be part of it," id., but then found
out that the police were looking for him, id. at 424-25. Accordingly, Charles went to the police

---

[2] Charles testified that Mark was in Haiti at the time of the trial. Tr. at 351.
[3] Woolcock is six feet and five inches tall. Id. at 572

on October 8, 2003, and reported that Woolcock was the shooter. Id. at 425.

Two days later, on October 10, 2003, Sergeant John Kelly and Detective Louie Remos conducted a "double blind lineup" for the case. Id. at 128. A "double bind lineup" is a lineup in which "the detective and the sergeant conducting that lineup have no prior knowledge of the case and no involvement in it." Id. Kelly and Remos were introduced to Charles and informed him that he would be viewing a lineup of individuals; they also instructed him to identify any individual whom he recognized. Id. at 130. The lineup consisted of Woolcock and five other men recruited from a men's shelter. Id. at 131, 256. Upon viewing the lineup, Charles identified Woolcock as the shooter. Id. at 353.

### 2. Woolcock's arrest

That same day, Detectives John Polacsek and Larry Eggers went to a multiple residential dwelling at 446 Kingston Avenue in search of Woolcock. Id. at 211, 252. As Woolcock testified, he frequented that building in 2003 because he had family members living there. Id. at 518. Specifically, his grandmother lived in the building, and he would sometimes stay with her. Id. at 541. In addition, Woolcock stored most of his personal belongings in the basement of the building, id. at 542, and would go there to eat, change his clothes, and clean up, id. at 532-33.

Upon arriving at 446 Kingston Avenue, Polacsek and Eggers spoke with Tyrone Mark, the building superintendent. Id. at 253, 434. When Eggers asked Mark if he knew Woolcock, Mark replied that the officers had just missed him, as Woolcock had been in the basement fifteen minutes to half an hour ago. Id. at 212-13. Soon after, however, one of Mark's assistants reported that Woolcock had returned. Id. at 213. Thereupon, Eggers went in search of Woolcock, whom he found walking rapidly through the basement corridor. Id. at 213-14. At

6

some point, Eggers lost sight of Woolcock but then heard a door shut. Id. at 214. Upon opening the door, Eggers saw a pasta dish cooking on top of a hot plate. Id. Looking around the room, he observed what looked like the door to an old electrical closet. Id. Eggers opened the door, found Woolcock hiding there, and arrested him. Id. at 214-15.

Woolcock testified at trial that he was hiding from Mark, id. at 533, because the superintendent "ha[d] a problem with [Woolcock] being specifically in the basement," id. at 541. Before Eggers discovered him, Woolcock had been trying to make something to eat before Mark caught him. Id. at 532. Woolcock hid in the electrical closet after seeing a worker, because the apartment workers always told Mark whenever they saw Woolcock in the basement. Id. at 536. As Woolcock explained, Mark would chase Woolcock out whenever he saw him in the basement; moreover, the superintendent had started threatening to call the police. Id. at 533. Although Mark never actually called the police, Woolcock "didn't want to take the chance." Id. In particular, he was nervous about Mark catching him using electrical equipment. Id. at 532, 536. Although Woolcock asserted that he "always" hid from Mark when he was in the basement, id. at 533, the superintendent testified that he "wouldn't say [that Woolcock was ever] hiding," id. at 438. However, Mark confirmed that he had begun threatening to call the police when he caught Woolcock in the basement. Id. at 449.

**D.    The Trial**

Woolcock was tried twice. Dkt. 1, at 13. The first time, the court declared a mistrial following three days of deliberation and four jury notes announcing an impasse. Id. The second time, the jury acquitted Woolcock of murder in the second degree but convicted him of manslaughter in the first degree. Trial Tr. at 797. As to his latter trial, Woolcock's petition focuses on the reliability of Charles's testimony, the direct examination of another witness

7

named Erroll Strachan, and the conduct and performance of both the prosecutor, Julie
Rendelman, and Woolcock's defense attorney, Arnold Levine.

### 1.    Charles's reliability

Levine attempted to impeach Charles through questions regarding his motives for
testifying, involvement in criminal activities, and prior inconsistent statements concerning the
September 22, 2003 and October 4, 2003 incidents.

#### i.    Motive for testifying

At the time of Woolcock's trial, Charles had a pending burglary case. Id. at 319.  When
questioned upon direct examination whether he had "receive[d] any promises of any kind from
[the prosecutor's] office" relating to the burglary case in return for his testimony in Woolcock's
case, Charles responded, "No." Id. at 319-20.  Upon cross-examination, the prosecutor also
asked Charles, "At any point did I tell you that I would help you in any way with your open
case?" Id. at 429.  To this, Charles likewise responded, "No.  I didn't want, with my open case, I
didn't want no plea bargain or nothing.  I didn't ask for no deal or nothing." Id.  Instead, Charles
explained his motive for testifying as follows: "[Cummings] was my friend and I would do it
again for him." Id.  Upon recross-examination, however, Charles admitted that he had been
given immunity in his burglary case with respect to his testimony in Woolcock's trial. Id. at 370.
It was his understanding that the prosecution "wouldn't use what [he] said in this case against
[him] in the burglary case." Id. at 430.

#### ii.    Involvement in criminal activities

Charles admitted that he sold crack cocaine to an undercover police officer in 1994. Id.
at 361.  However, he testified that he stopped doing so after being prosecuted and pleading guilty
to criminal sale of a controlled substance in the third degree. Id. 364-65.  Around early 2002,

Charles started selling marijuana instead and continued to do so until 2004. Id. at 365-66. Charles also testified that he smoked marijuana "once in a blue moon," which he clarified to mean once every two weeks. Id. at 360-61. However, he stated that he did not smoke marijuana back in 2003. Id. at 361.

In addition, Charles acknowledged that he had been charged with burglary after entering an abandoned apartment above a grocery store on July 18, 2005. Id. at 367-68. Charles had entered the building with an intent to "break into that grocery store and steal the weed" inside. Id. at 368. At Woolcock's trial, Charles denied having a crowbar during the burglary and stated that he only had a flashlight in his hand. Id. at 369-71. Levine then confronted Charles with his sworn testimony from a prior proceeding, in which Charles allegedly stated that he had a crowbar but not a flashlight. Id. at 371. In response, Charles replied that he did not remember having made any such statement. Id. at 371-72.

When Charles was arrested for the alleged burglary, he informed the police that his address was 770 Nostrand Avenue. Id. at 377. As Charles admitted, he also hosted a gambling spot at that address. Id. at 374.

### iii.    Prior inconsistent statements

On direct examination, Charles testified that he had heard the argument between Woolcock and Cummings on September 22, 2003, and knew that they were arguing "about three dollars and a bag of weed." Id. at 377-78. However, he subsequently admitted that he had given a different sworn account before the grand jury in October 2003. Id. at 378-81. Charles had informed the grand jury that although he saw the argument and heard the commotion, he did not actually know what Woolcock and Cummings were arguing about. Id. at 380-81. In addition, Charles conceded that he had given yet another different account to the assistant prosecutor who

9

interviewed him on October 8, 2003. Id. at 385-86. When questioned by the assistant prosecutor whether he had been present for the September 22, 2003 incident, Charles had replied under oath, "No. [Cummings] was telling me everything that happened." Id. at 386.

In addition, Charles had made prior, sworn statements about the October 4, 2003 incident that varied from his testimony at trial. During his October 8, 2003 interview with the assistant prosecutor, Charles stated under oath on audiotape that he had seen Woolcock only once or twice before the latter's confrontations with Cummings. Id. at 389. Subsequently, during an October 2005 proceeding, Charles testified under oath that he had seen Woolcock "[a]bout six times." Id. at 389. And, at trial, Woolcock claimed to have seen Woolcock over fifteen times. Id. at 387. Furthermore, after Charles testified that he had seen Woolcock approaching prior to the shooting, id. at 399, Levine asked whether Charles remembered making a sworn statement on October 8, 2003, that he did not, in fact, see Woolcock approaching, id. at 403. Charles claimed that he could not remember having made such a statement. Id. at 404. Charles also stated that he could not remember having told the prosecutor on October 8, 2003, that he did not see the gun until Cummings grabbed him and tried to use him as a shield. Id. at 405.

Charles also gave differing accounts about what happened after the shooting. For example, he testified at trial that only he and his friend Mark pursued Woolcock, id. at 416, and that he personally saw Woolcock enter a building toward the end of the chase, id. at 421. In contrast, Charles had stated during the October 8, 2003 interview that his "best friend," whom he had not seen for a while, also participated in the chase, id. at 419, and that Charles had resorted to asking a woman whether she had seen anybody entering the building. Id. at 421-22.

There were also other minor inconsistencies between Charles's accounts. For example, Charles testified at trial that the second argument between Woolcock and Cummings took place

10

at the corner of St. Johns and Nostrand. Id. at 391. In contrast, he had informed the detective on

October 8, 2003, that the argument took place at Sterling and Nostrand. Id. at 393. In addition,

whereas Charles testified at trial that Woolcock's gun jammed only once after he shot

Cummings, he had stated earlier that the gun jammed four or five times. Id. at 410-11.

Furthermore, although Charles testified on direct examination that, after crawling under the van,

he had looked up at Woolcock, id. at 349-50, he stated on cross-examination that he had stared at

the gun because he wanted to make sure that it would not be pointed at him, id. at 413.

### 2.    Examination of Erroll Strachan

In addition to Charles, another witness whom the government called was Erroll Strachan,

the elder of the Rastafarian church that Woolcock attended. Id. at 308. The prosecutor's direct

examination of Strachan proceeded, in part, as follows:

> Q    Let me ask you, did there come a time in October of 2003, when tall man
>      [i.e., Woolcock] told you anything?
> A    Well, you know, a day or two before he got locked up, I saw him in the
>      park, and he told me that people tell him he shouldn't fight with the guy
>      and shouldn't do anything with the guy. I told him the same thing, he
>      shouldn't fight with the guy either. At that time I didn't know what
>      happened yet.
> Q    Let me ask you, what did he say to you about the guy?
> A    Well, I can't remember he said anything to me about the guy, besides
>      people tell him that he shouldn't fight with the guy.
> Q    Mr. Strachan, do you remember him telling you that he wanted to hurt the
>      guy?
> A    No, I can't remember that.
> Q    You don't remember him telling you that?
> A    No. That is his private business, you know.
>      . . . .
> Q    Did you tell him what would happen if he did fight with the guy?
> A    Na.
> Q    So do you recall telling him that if he did --
>      MR. LEVINE: Objection.
>      THE COURT: Overruled.
> Q    hurt the guy, that you wouldn't be there for him anymore?
> A    Can't remember telling him that.
>      . . . .

11

| Q | At the time he was telling you about the guy, did you realize who he was talking about? |
| A | No, I didn't know who he was talking about. |
| Q | Did there come a point where you realized who he was talking about? |
| A | Not until after I heard what had happened. |
| Q | Not until after Damien [i.e., Cummings] was killed, right? |
| A | Yes. |
| Q | And then you realized it was Damien, right? |
| A | Yeah. |

MR . LEVINE: Objection.

THE COURT: Sustained. The jury is to disregard it.

Id. at 311-15.

### 3.    The Prosecutor's Summation Comments

#### i.    Comments about Erroll Strachan

During her closing argument, Rendelman recounted her direct examination of Strachan,

in relevant part, as follows:

> MS. RENDELMAN: Mr. Strachan says he is a peace-loving man, and I submit to you that is probably true, and Mr. Strachan tells you about conversations he had with the defendant.
> And I asked him, well, do you remember him telling you that he wanted to do something to the person he had been fighting with? He said, no, I don't remember. Do you remember telling him that if he did something, you're not going to be there for him?
> MR. LEVINE: Objection.
> THE COURT: Overruled.
> MR. LEVINE: She is not a witness.
> THE COURT: Overruled, talking about Strachan's testimony.
> MS. RENDELMAN: No, I don't remember what was the conversation. He was telling me something about fighting.
> And you know what he says, and this is what we talked about before, he told him, you shouldn't fight with the guy. He said people told me not to do anything to the guy, people told him not to do anything to the guy.
> I submit to you, ladies and gentlemen, perhaps Mr. Strachan's memory is not too good as it was two years ago, but Mr. Strachan knows that the defendant knows much more than he submitted.
> MR. LEVINE: Objection.
> THE COURT: Overruled.

Id. at 676-77.

12

### ii.    Comments about Monica Joseph

The prosecutor also revisited her direct examination of Joseph; among other things,

Rendelman asserted:

> She tells you, unequivocally, she doesn't see his face. And you heard her
> testimony, ladies and gentlemen. I submit to you she came in here, she told you
> the things she remembered, and perhaps, ladies and gentlemen, she wasn't fully
> telling you everything she knows, I can't tell [] you what motivates people, but I
> don't know that she told you everything she knew.

Id. at 671.

### iii.    Comments about assessing truthfulness

In addition, Rendelman made the following comment in her closing argument about the

implications of accepting Woolcock's statements as true:

> MS. RENDELMAN: There is one person in this case who had the most to
> gain by looking each one of you in the eye and not telling you the truth, and that's
> this defendant. And if you believe this defendant, you have to believe that every
> single other person in this case
> MR. LEVINE: Objection.
> MS. RENDELMAN: -- is not telling the truth.
> THE COURT: Overruled.

Id. at 680.

### iv.    Motion for mistrial

At the close of the prosecution's summation, Levine brought a motion for mistrial. Id. at

685-92. He specified two bases for the motion: (1) "Rendelman's argument that to believe Mr.

Woolcock, you have to believe all the other witnesses are lying"; and (2) her suggestion that

Strachan "might not have been completely candid." Id. at 686.

The judge denied Levine's motion for mistrial. Id. at 692. However, he issued the

following curative instruction to address Rendelman's comment about ascribing truth to

Woolcock's testimony:

Ladies and gentlemen, to begin, I just want to clarify something for you, because in her summation Miss Rendelman at one point . . . indicated that in order to believe the defendant, you'd have to believe that all the other witnesses were not telling the truth.

And as I will instruct you in a minute, what your job is in evaluating the testimony, is to determine whether the witnesses are being truthful, whether they're deliberately lying or they're simply mistaken. So there are a number of issues that you have to resolve, not merely that someone is consciously not telling the truth, but whether or not they are not telling the truth, whether they are telling the truth, or whether they're simply mistaken . . . .

Id. at 693. In addition, the judge later elaborated, "[Y]ou, the jury, must decide whether the witness has testified truthfully or falsely, or you are satisfied that the witness has not consciously testified falsely, whether their recollection about the events about which they testified is accurate and reliable or inaccurate and unreliable." Id. at 705.

### 4. The jury deliberations

During deliberations, the jury sent the judge several notes requesting readbacks of portions of the record. A number of these requests focused on Charles's testimony. The jury's first note requested "Kenneth Charles' testimony in regards to audio interview regarding seeing the shooter." Id. at 741. In response, the judge replied that he did not understand what exactly the jury was requesting: "I don't know if they're asking for his testimony and the audio or the audio, the testimony that relates to the audio. I think we need some clarification of that." Id.

The jury then sent a note specifying that it wanted to rehear "Ken Charles' actual audiotape and transcript re: audio interview, actual testimony in this court, re: audio." Id. at 753. The note also requested a rehearing of "the transcript regarding the audio interview, actual testimony in this court regarding audio." Id. at 759. After an extended conversation with Rendelman and Levine regarding the meaning of this note, the judge told the jury, "I received your note, which clarifies things to some extent, and still leaves me a little confused to a certain extent as well, so let me deal with what is clear and then I'll ask you to clarify what is less clear."

14

Id. at 758-59. Thereupon, the judge played the requested audio tape and asked the jury to clarify the remainder of its request. Id. at 759-60.

The jury then sent the judge a note saying, "We are requesting Barrington's response in regards to days before or after the October 4th incident, by the D.A. and Ken Charles actually seeing shooter's face or actually identifying shooter by defense cross-examination." Id. at 778. Despite an extended discussion, the judge, Levine, and Rendelman were unable to reach a consensus on what the jury wanted to rehear. As a result, the judge summoned the jury and explained that he was "having difficulty . . . understanding precisely what's being sought in some of these questions." Id. at 786. In response, the jury clarified that it wanted to rehear "[t]he whole cross of the defendant and the whole cross of Charles." Id. at 788.

Before beginning with these readbacks, the judge instructed the jury, "[Y]ou can authorize your foreperson to end the readback when you heard what you're interested in." Id. at 790. The judge then ordered the court reporter to read back Rendelman's cross-examination of Woolcock. Id. Next, the judge ordered the court reporter to read back Levine's cross-examination of Charles. Id. at 793. Part way through the readback, the foreperson announced, "Judge, we heard enough." Id. The judge thereby stopped the readback and instructed the jury to let the court know if it wanted to rehear anything else. Id. at 793. The jury made no further requests for readbacks before reaching its verdict. Id. at 794-97.

## E.    Subsequent history

Following his conviction on February 22, 2006, Dkt. #6-1, at 5, Woolcock filed an appeal in the Appellate Division of the New York Supreme Court on June 27, 2008, id. at 57. Woolcock's opening brief, prepared by appellate counsel, argued that: (1) there was insufficient evidence to sustain Woolcock's conviction; (2) Woolcock was denied due process through both

15

the prosecutor's improper examination of Strachan, which suggested that Woolcock had told Strachan that he wanted to hurt Cummings, and her inappropriate summation comments; and (3) Woolcock was denied the effective assistance of counsel when Levine failed to object properly to the prosecutor's errors. Id. at 3.

Woolcock also filed a pro se supplemental brief contending that: (1) he was denied the effective assistance of counsel when Levine accused the judge of wanting to have sexual relations with Redelman, thereby causing the judge to "show[] prejudice in that he generally displayed impatience and intolerance in regard to questions and requests from the jurors," Dkt. # 6-3, at 9; and (2) he was deprived a fair trial when Rendelman suggested in the jury's presence that Woolcock had become "very angry and unruly" upon seeing Strachan brought into court prior to trial on a material witness warrant, thereby "insinuat[ing] that the defendant's behavior was different when the jury was not present," id. at 10.

The Appellate Division of the New York Supreme Court denied Woolcock's appeal on October 13, 2009. People v. Woolcock, 886 N.Y.S.2d 359. The court explained, "Viewing the evidence in the light most favorable to the prosecution . . . , we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." Id. at 359. In addition, the court concluded that Woolcock's "remaining contentions, including those raised in his supplemental pro se brief, either are without merit or do not require reversal under the facts of this case." Id.

With the assistance of appellate counsel, Woolcock applied for leave from the Court of Appeals of New York to appeal the decision of the New York Supreme Court Appellate Division. Dkt. #1, at 13, 19. The Court of Appeals of New York issued a summary denial. People v. Woolcock, 898 N.Y.S.2d 106 (N.Y. 2010). Subsequently, Woolcock filed the instant petition, raising the same issues that were raised in his briefs before the New York Supreme

16

Court. Dkt. #1, at 2-3.

## II. DISCUSSION

**A.    Standard of Review**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a

deferential standard that federal habeas courts must apply when reviewing state court

convictions.  28 U.S.C. § 2254(d).  The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States . . . .

Id. The phrase "clearly established Federal law, as determined by the Supreme Court of the

United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's

decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362,

412 (2000).  A state court decision is "contrary to" clearly established Supreme Court precedent

if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court

confronts a set of facts that are materially indistinguishable from a decision of [the Supreme]

Court and nevertheless arrives at a result different from that precedent." Id. at 405-06.  With

respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether

the state court's application of clearly established federal law was objectively reasonable." Id. at

409.  "Where a state court's decision is unaccompanied by an explanation, the habeas

petitioner's burden still must be met by showing there was no reasonable basis for the state court

to deny relief." Harrington v. Richter, --- U.S. ---, 131 S. Ct. 770, 784 (2011).

17

## B.    Sufficiency of Evidence

Woolcock argues that there was insufficient evidence to sustain his conviction for first-degree manslaughter.  Under New York law, a person is guilty of first-degree manslaughter when "[w]ith intent to cause serious physical injury to another person, he causes the death of such person . . . ."  N.Y. Penal L. § 125.20.  Woolcock does not dispute that the evidence was sufficient to prove that the person who shot Cummings intended to cause physical injury or that the gunshot wounds resulted in Cummings's death.  Instead, he claims only that the evidence was insufficient to prove that he was the shooter.

In concluding that "the verdict of guilt was not against the weight of the evidence," People v. Woolcock, 886 N.Y.S.2d at 360, the state appellate court did not unreasonably apply the Supreme Court precedent of Jackson v. Virginia, 443 U.S. 307 (1979).  Jackson sets forth the standard for evaluating challenges to the sufficiency of evidence supporting a state-court criminal conviction.  Epps v. Poole, 687 F.3d 46, 50 (2d Cir. 2012).  Under the Jackson standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  443 U.S. at 319.

The court thus "review[s] collateral challenges to the sufficiency of the evidence supporting a state-court jury's verdict under a doubly deferential standard of review."  Garbutt v. Conway, 668 F.3d 79, 81 (2d Cir. 2012).  It first defers to the jury's verdict, drawing all inferences and resolving all issues of credibility in favor of the prosecution.  Epps, 687 F.3d at 50; United States v. Regan, 103 F.3d 1072, 1084 (2d Cir. 1997); see, e.g., United States v. Archer, 671 F.3d 149, 160 (2d Cir. 2011).  It then "defer[s] to the state court['s] rejection of the

18

defendant's constitutional arguments, at least insofar as it did not result from . . . an unreasonable application of clearly established federal law." Epps, 687 F.3d at 50; see 28 U.S.C. § 2254(d)(1).

Given the absence of physical evidence linking Woolcock to the shooting, the government's case rested primarily on Charles's eyewitness identification. Woolcock makes much of the government's reliance on the "unreliable testimony of a felon and marijuana user." Dkt. #6-1, at 33. However, the Second Circuit has held that "'the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction,'" United States v. Frampton, 382 F.3d 213, 222 (2d Cir. 2004) (quoting United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979)), and there is no reason to depart from this general rule here. Indeed, it is well-established that an eyewitness's testimony can suffice to ground a conviction even if the "testimony is uncorroborated and comes from an individual of dubious veracity." Foxworth v. St. Amand, 570 F.3d 414, 426 (1st Cir. 2009); accord Wood v. Schwartz, 589 F.3d 368, 377 (7th Cir. 2009); United States v. Butler, 636 F.2d 727, 729 (D.C. Cir. 1980), cert. denied sub nom., Butler v. United States, 451 U.S. 1019 (1981); Huber v. Schriver, 140 F. Supp. 2d 265, 277-278 (E.D.N.Y. 2001).

Notably, the Second Circuit declined to depart from the single-eyewitness rule in United States v. Frampton, in which it rejected the defendant's proposed "rule that the testimony of a single, uncorroborated, and potentially biased witness, standing alone, is generally insufficient to support a conviction." 382 F.3d at 222. In Frampton, the defendant and his friend, Cooley, schemed to kill and take over the drug enterprise of another individual named Henry. Id. at 216. Ultimately, Cooley was also indicted for his role in the plan to murder Henry. Id. at 221 n.7. Prior to trial, however, Cooley entered into a plea and cooperation agreement, whereby he testified as a government witness in Frampton's trial in exchange for a reduced sentence. Id. at

19

221 n.7. Frampton assailed Cooley's credibility on appeal, pointing to his cooperation

agreement with the government. Id. Despite the questionable veracity of Cooley's testimony,

the Second Circuit held that it was sufficient to sustain Frampton's conviction. Id. at 222.

Here, as in Frampton, there was some reason to doubt Charles's credibility. In particular,

Charles's trial testimony differed in many details from his previous sworn statements to the

government and before the grand jury. However, unlike Cooley, Charles appeared to have little

reason to falsely inculpate Woodcock, as he received no benefit in his pending burglary case in

exchange for testifying at Woolcock's trial. Furthermore, that Charles was a drug dealer, drug

user, and convicted felon does not preclude a reasonable juror from concluding that Charles

testified truthfully in a case that had nothing to do with his own involvement in drugs and crimes.

In any event, the court must "resolve all inferences from the evidence and issues of

credibility in favor of the verdict." United States v. Howard, 214 F.3d 361, 363 (2d Cir. 2000).

A reasonable juror could certainly believe that Charles's memory faded over the more than two

years that elapsed between his initial interview with the government and Woolcock's trial.

However, a reasonable juror could also believe that Charles's memory of the dispositive fact—

the shooter's identity—remained accurate.

In particular, Charles stated that he witnessed the shooting from a distance of one foot in

daylight, and that he had seen Woolcock at least once or twice before. Even if the events

surrounding the shooting unfolded quickly, Charles indicated that he had adequate opportunity to

observe Woolcock from a close distance. Charles also unequivocally identified Woolcock at the

police lineup within a week of the shooting. As the government argues, "[w]hatever other

inconsistencies may have existed in Charles's testimony, Charles never wavered from identifying

defendant as [the] person he had seen shoot Cummings." Respondent's Affirmation in

20

Opposition to Petition for a Writ of Habeas Corpus 19. Resolving the issue of Charles's

credibility in the government's favor, as required by the <u>Jackson</u> standard, the court concludes

that a reasonable juror could find that Charles truthfully identified Woolcock as the person who

shot Cummings.

In light of Charles's eyewitness testimony and the corroborating evidence that Woolcock

had a motive to harm Cummings based on the prior, violent confrontation between the two, the

state appellate court did not unreasonably apply <u>Jackson</u> in concluding that there was sufficient

evidence to support Woolcock's conviction.[4]

## C.   Due Process

Woolcock also contends that he was denied due process through errors in the

prosecutor's direct examination of Strachan, cross-examination of petitioner, and closing

argument. Dkt. #6-1, at 42.

### 1.   Direct examination of Erroll Strachan

Petitioner first argues that the prosecutor improperly elicited Strachan's testimony that,

after hearing about Cummings's death, Strachan realized that "the guy" whom Woolcock had

been warned against fighting was Cummings. Dkt. #6-1, at 47. However, Levine objected to

this testimony, and the judge sustained the objection, instructing the jury to disregard Strachan's

response. Tr. at 314-15; <u>see also</u> <u>Trademark Research Corp. v. Maxwell Online, Inc.</u>, 995 F.2d

326, 340 (2d Cir. 1993) ("It must be assumed that the jury followed instructions.").

Petitioner next contends that the prosecutor posed a question to Strachan suggesting the

---

[4] Woolcock challenges the government's "motive evidence that the September 22, 2003, initial altercation impelled appellant to shoot Cummings." Dkt. #1, at 15. However, a reasonable juror could believe that Woolcock, who struck Cummings with a large, iron pipe during the initial confrontation, was the same individual who employed violent force against Cummings two weeks later. In addition, Woolcock contends that "Joseph, a disinterested prosecution witness, . . . admitted telling appellant's counsel that she did not believe appellant was the shooter." <u>Id.</u> However, Joseph also testified that she did not get a good look at the shooter's face and that she did not think that she could actually identify him. Thus, Joseph's testimony does little to discredit Cummings's identification.

existence of facts not in evidence. Dkt. #6-1, at 46. Specifically, Rendelman asked Strachan, "[D]o you remember [Woolcock] telling you that he wanted to hurt the guy?" Tr. at 311. Strachan responded that he did not remember. Id. New York courts have expressed a "concern that the prosecution might misuse impeachment techniques to get before a jury material which could not otherwise be put in evidence because of its extrajudicial nature." People v. Fitzpatrick, 40 N.Y.2d 44, 50 (1976). In People v. Welch, for example, the New York Supreme Court Appellate Division reversed a conviction because "[t]he prosecutor under the guise of impeaching the witness or refreshing his recollection proceeded to get before the jury all of the relevant contents of the affidavit made by the two witnesses." 229 N.Y.S.2d 909, 912 (N.Y. App. Div. 1962) (internal citation omitted). The prosecutor in Welch did so by "prefacing each question with the words 'Do you recall making this statement' followed by a direct quotation from the statement." Id.

At the same time, the Court of Appeals of New York has held that an attorney may persist in cross-examination on a prior inconsistent statement after receiving a negative response if he has a genuine basis for believing that a different answer may be forthcoming: "As long as he acts in good faith, in the hope of inducing the witness to abandon his negative answers, the prosecutor may question further." People v. Sorge, 301 N.Y. 198, 200 (1950). As that court explained, "a negative response will not fob off further interrogation of the witness himself, for, if it did, the witness would have it within his power to render futile most cross-examination." Id. at 200-201. Here, it is unclear from the record whether Strachan did, in fact, make a prior statement to the government asserting that Woolcock had told him that he wanted to "hurt the guy," Tr. at 311. Without any indication in the record that Rendelman did not have a good faith basis for believing that Strachan might change his response, the court cannot conclude that the

22

prosecutor acted improperly in her line of inquiry.

Even if she did, absent good faith basis, her misconduct would not justify granting Woolcock's petition. "A federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law." Pulley v. Harris, 465 U.S. 37, 41 (1984); accord Wilson v. Corcoran, --- U.S. ---, 131 S. Ct. 13, 16 (2010) ("[I]t is only noncompliance with federal law that renders a State's criminal judgment susceptible to collateral attack in the federal courts."). Instead, "to prevail on a claim that an evidentiary error deprived the defendant of due process under the Fourteenth Amendment he must show that the error was so pervasive as to have denied him a fundamentally fair trial." Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) (citing United States v. Agurs, 427 U.S. 97, 108 (1976)). The test for assessing whether incorrectly admitted evidence denied the defendant of a fair trial is "whether the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Id. at 19. In other words, that evidence "must have been 'crucial, critical, highly significant.'" Id. (quoting Nettles v. Wainwright, 677 F.2d 410, 414-15 (5th Cir. 1982)).

The prosecutor's intimation that Woolcock told Strachan that he wanted "to hurt the guy," Tr. at 311, was not sufficiently material either to ground Woolcock's conviction or to eliminate reasonable doubt as to his identity as the shooter. The jury already had admissible evidence from which to infer that Woolcock had expressed a desire to harm Cummings. For example, Woolcock acknowledged on cross-examination that he "talk[ed] to people" about his earlier confrontation with Cummings because he was "angry about it." Id. at 567. This fact, combined with evidence that people had warned Woolcock not to "fight with the guy," id. at 311, creates an inference that Woolcock had expressed to others that he wanted to fight

23

Cummings. Moreover, as discussed, Charles's testimony was independently sufficient to support Woolcock's conviction. Petitioner does not raise a colorable argument that the jury's decision would have been different had the judge excluded the prosecutor's inquiry as to whether Woolcock had told Strachan that he wanted to "hurt the guy," Tr. at 311. Accordingly, the prosecutor's questioning did not deny Woolcock a fair trial.

### 2.    Cross-examination of Woolcock

Woolcock also argues that he was deprived of due process when the prosecutor questioned him, in the jury's presence, about his reaction to Strachan's prior appearance in court on a material witness warrant. Dkt. #6-3, at 10. Specifically, the prosecutor asked Woolcock whether he remembered yelling when he saw Strachan. Tr. at 564. The judge then held a bench conference off the record. Subsequently, the prosecutor asked Woolcock twice whether he had become angry upon seeing Strachan enter the courtroom, and Woolcock responded in the negative each time. Id. at 565. Woolcock now contends that the prosecutor's questions "insinuated that the defendant's behavior was different when the jury was not present," thereby biasing the jury against him and depriving him of a fair trial. Dkt. #603, at 10.

In light of the off-record discussion between the trial judge and counsel, this court has no basis for assessing whether Renderlman posed the questions to Woolcock in good faith. Cf. Sorge, 301 N.Y. at 200. Accordingly, the court cannot conclude that the prosecutor's questions were improper. Even if these questions were improper, however, it would be absurd to surmise that they constituted the basis of Woolcock's conviction. Accordingly, Woolcock was not deprived of a fair trial through Rendelman's questions regarding his reaction to seeing Strachan appear in court.

### 3.    The prosecutor's summation comments

In addition, Woolcock maintains that he was deprived of due process through the prosecutor's improper summation comments. Dkt. #6-1, at 3. "In order to reach the level of a constitutional violation, a prosecutor's remarks must 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" Gonzalez v. Sullivan, 934 F.2d 419, 424 (2d Cir. 1991) (alteration in original) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)); see also Darden v. Wainwright, 477 U.S. 168, 181 (1986); Garofolo v. Coomb, 804 F.2d 201, 206 (2d Cir. 1986). In other words, "[p]rosecutorial misconduct during summation is grounds for reversal only when the remarks caused 'substantial prejudice' to the defendant." Gonzalez, 934 F.2d at 424 (quoting United States v. Tutino, 883 F.2d 1125, 1136 (2d Cir.1989), cert. denied, 493 U.S. 1081 (1990)). Accordingly, the court "must assess how prejudicial the prosecutor's conduct was, what measures, if any, the trial court used to cure the prejudice, and whether conviction was certain absent the prejudicial conduct." Id. citing (United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981), cert. denied, 456 U.S. 989 (1982)).

Woolcock first points to the prosecutor's summation comments regarding her direct examination of Strachan. In particular, Rendelman drew the jury's attention to her inquiry as to whether Strachan remembered telling Woolcock "that if he did something, [Strachan was] not going to be there for him." Tr. at 677. Focusing on Strachan's denial that he remembered making such a statement, Rendelman speculated, "I submit to you, ladies and gentlemen, perhaps Mr. Strachan's memory is not too good as it was two years ago, but Mr. Strachan knows that the defendant knows much more than he submitted." Id.

The prosecutor made a similar comment with respect to Joseph. After reminding the jury that Joseph had denied seeing the shooter's face, the prosecutor stated, "I submit to you . . . ,

25

ladies and gentlemen, she wasn't fully telling you everything she knows, I can't tell [] you what motivates people, but I don't know that she told you everything she knew." Id. at 671.

Woolcock correctly argues that these comments were improper. "It is fundamental that the jury must decide the issues on the evidence, and therefore fundamental that counsel, in summing up, must stay within the four corners of the evidence . . . ." People v. Ashwal, 39 N.Y.2d 105, 109 (1976) (internal quotation marks omitted). Accordingly, attorneys "may not refer to matters not in evidence or call upon the jury to draw conclusions which are not fairly inferrable from the evidence." Id. at 109-110 (internal citations omitted). Rendelman's comments create an inference that Strachan and Joseph previously told the government information incriminating Woolcock that they later refused to disclose at trial. However, there is nothing in the record to support this inference. Accordingly, Rendelman improperly "suggested the existence of facts not in evidence," with the impermissible effect of making herself an unsworn witness. People v. Paperno, 54 N.Y.2d 294, 301 (1981). As the Court of Appeals of New York has explained, "[s]uch conduct on the part of the prosecutor amounts to a subtle form of testimony against the defendant, as to which the defendant may have no effective means of cross-examination." Id.

Although improper, Rendelman's summation comments regarding Strachan and Joseph did not "'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'" Gonzalez, 934 F.2d at 424 (alteration in original) (quoting Donnelly, 416 U.S. at 643). Significantly, the judge delivered curative instructions to the jury following closing argument. See id. Specifically, the judge instructed the jurors that they should make their determinations based upon the actual evidence rather than counsels' summation of evidence. Tr.

694. The judge also instructed the jury not to consider or speculate on matters not in evidence.[5] Id. at 696. In Trademark Research Corp. v. Maxwell Online, Inc., the Second Circuit held that "[i]t must be assumed that the jury followed instructions." 995 F.2d at 340; cf. United States v. Elfgeeh, 515 F.3d 100, 126-27 (2d Cir. 2008) ("Where an inadmissible statement is followed by a curative instruction, the court must assume 'that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant.'") (quoting Greer v. Miller, 483 U.S. 756, 766 n.8 (1987)). Notably, the Trademark court issued its holding in response to circumstances akin to those in Woolcock's case: after plaintiff's counsel strayed beyond the "four corners of the evidence," Ashwal, 39 N.Y.2d at 109 (internal quotation marks omitted), during closing argument, the trial judge instructed the jury "that statements by counsel are not evidence," Trademark, 995 F.2d at 340. Here, as in Trademark, the court must assume that the jury followed the trial judge's instructions to not treat the prosecutor's statements as evidence.

Furthermore, any prejudicial effect of the prosecutor's comments cannot be characterized as substantial in light of the record as a whole: Charles, who had no apparent motive for falsely implicating Woolcock, identified petitioner as the shooter in a police lineup within a week of the crime; Charles, Marcus, and Jimenez all testified to Woolcock's previous altercation with Cummings and his use of violent force against Cummings during that incident; Woolcock admitted to being angry about the previous altercation and talking to people about it; and Woolcock told Strachan that people had advised him not to fight "the guy," Tr. at 311.

---

[5] The judge had also given the jury similar instructions before closing arguments. For example, he stated "[W]hat the attorneys say to you in their closing arguments is not evidence in the case." Id. at 621-22. The judge also noted, "[I]t is not their recitation of [the witnesses'] testimony of their characterization of it that should govern your deliberations, but your own recollection of the testimony and your own analysis of that testimony." Id. at 622.

Woolcock also argues that the prosecutor made an improper comment when she told the jurors, "[I]f you believe this defendant, you have to believe that every single other person in this case . . . is not telling the truth." Tr. at 680. This comment was, indeed, improper. As the New York Supreme Court has explained:

> We have often held, especially in close cases revolving around the identification testimony of the complainant, . . . that comments which indicate to the jury that in order to acquit the defendant they must find that the complainant lied, are improper and prejudicial, since such comments tend to divert the jury's attention away from the central issue of identification and to shift the burden of proof thereon to the defendant.

People v. Langford, 545 N.Y.S.2d 610, 611 (N.Y. App. Div. 1989) (internal citations and quotation marks omitted). Here, however, the judge directly referenced the prosecutor's improper comment and delivered corresponding curative instructions. Tr. at 693, 705. And, as discussed, "[i]t must be assumed that the jury followed instructions." Trademark, 995 F.2d at 340 (2d Cir. 1993).

Accordingly, even though the prosecutor's comments were improper, they were not so prejudicial as to reach the level of a constitutional violation. This is particularly so in light of the judge's curative instructions and the overall evidence implicating Woolcock as the shooter. The state appellate court therefore did not unreasonably apply Supreme Court precedent in rejecting Woolcock's due process claims.

## D. Ineffective Assistance of Counsel

A petitioner seeking a writ of habeas corpus on ineffective assistance of counsel grounds faces a heavy burden in establishing entitlement to relief. Strickland v. Washington, 466 U.S. 668 (1984), established the two-prong test by which ineffective assistance of counsel claims are adjudicated. See Harrington, 131 S. Ct. at 780. Under Strickland, a petitioner must demonstrate, first, that counsel's performance fell below "an objective standard of reasonableness" under

28

"prevailing professional norms," id. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A court need not decide both prongs of the Strickland test if a there is an insufficient showing on one. See id. at 697. In analyzing a claim that counsel's performance fell short of constitutional standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] might be considered sound trial strategy" Id. at 689 (internal quotation marks omitted). In so doing, it must "affirmatively entertain the range of possible reasons [petitioner]'s counsel may have had for proceeding as they did." Cullen v. Pinholster, --- U.S. ---, 131 S. Ct. 1388, 1407 (2011) (citation and internal quotation marks omitted).

Moreover, when ineffective assistance of counsel claims are presented on collateral habeas review, the court assesses them subject to the strictures of AEDPA and must be "doubly deferential" in reviewing the state court's determination that counsel acted effectively. Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (per curiam)); see 28 U.S.C. § 2254(d). In order to prevail on an ineffective assistance of counsel claim on habeas review, a petitioner must show not only that counsel's performance fell below the Strickland standard but also that the state court's adjudication of the Strickland standard was itself unreasonable. See Harrington, 131 S. Ct. at 785. Stated differently, the court may afford habeas relief only upon a finding that the state court was unreasonable—and not merely incorrect—in concluding that counsel's performance did not fall below an objective standard of reasonableness or, if it did, that petitioner was not prejudiced as a result. See id.

### 1. Failure to properly object to the prosecutor's errors

Woolcock argues that Levine's performance fell below constitutional standards when he

29

failed to object adequately to the prosecutor's misconduct during the evidentiary phase of trial. In particular, Levine did not object when Rendelman asked Strachan whether he remembered Woolcock expressing a desire "to hurt the guy." Tr. at 311. As discussed, however, there is nothing in the record indicating that the prosecutor lacked a good faith basis for pursuing this line of questioning. There is thus no record basis for contending that Levine could have raised a valid objection.

"[I]ndulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, the court must assume that the prosecutor had a good faith basis for her question and that Levine was aware of that basis. For example, if Levine knew or suspected that Strachan had actually made such a prior statement to the prosecutor, then it may have been "sound trial strategy," id. (internal quotation marks omitted), to avoid scrutiny of whether Rendelman's questioning of Strachan was proper.

Woolcock further alleges that Levine failed to object when the prosecutor asked Strachan whether he ultimately realized that Woolcock's comments about "the guy" referred to Cummings. Dkt. #1, at 16. Levine, however, did object. Id. at 315.

### 2.    Inappropriate comment regarding the judge and prosecutor

Next, Woolcock maintains that Levine rendered ineffective assistance by making a grossly inappropriate comment that biased the judge against Woolcock and ultimately deprived him of a fair trial. Dkt. #6-3, at 8-9. Specifically, Levine told the prosecutor, "[T]he reason the Court basically is ruling the way he is, is because the Judge has a crush on you and he just wants to fuck you." Tr. at 498-99.

After Rendelman informed the judge of Levine's comment, Levine apologized repeatedly to both the prosecutor and the judge. Id. at 499, 547-551. For example, he acknowledged to the

judge, "It was way over the line. I let my emotions get the best of me. I said it without even thinking, and I again apologize sincerely to you, Miss Rendelman, for it, and any court personnel who became aware of it, because I set a bad example." Id. at 548. He also added, "I don't want it reflecting bad on my client." Id. The judge accepted Levine's apologies, and Levine clarified for the record that he did not "think that there was a basis" for his comment. Id. at 549.

Although Levine's comment was undoubtedly inappropriate, offensive, and unbecoming of an attorney, he apologized profusely to both the judge and the prosecutor for having made it. Woolcock nonetheless alleges that the judge "displayed impatience and intolerance in regard to questions and request form the jurors," #6-3, at 9, notwithstanding Levine's apologies. Specifically, Woolcock insists that "the Court erred when it allowed the jury foreperson to cut off a readback of the testimony of the only eyewitness." Id.

With respect to this claim, Woolcock's case bears a strong resemblance to People v. Ortiz, 697 N.Y.S.2d 78 (N.Y. App. Div. 1999). In Ortiz, the jury sent multiple notes to the judge requesting readbacks of testimony. Id. at 79. In rejecting the defendant's claim that the trial judge erred by cutting off a readback, the court explained, "The Trial Judge never completed the readback of testimony which was requested in the second note because, after part of the testimony had been read, and a recess taken, the jury sent a note saying that it did not need to hear more." Id. Here, as in Ortiz, the trial judge committed no error when he deferred to the jury's indication that it had heard enough of the readback. Furthermore, as in Ortiz, "[a]t all times, the Trial Judge indicated his willingness to abide by the wishes of the jurors." Id. When the jury sent notes that did not clearly indicate what evidence it wanted to have read back, the judge repeatedly asked for clarification and ultimately acceded to the jury's requests.

In light of the foregoing, Levine's performance did not fall below constitutional

31

standards, and the state appellate court did not unreasonably apply <u>Strickland</u> in denying

Woolcock's ineffective assistance claims.

## III. CONCLUSION

The petition for a writ of habeas corpus is denied. Because Woolcock has failed to make

a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the court

declines to issue a certificate of appealability. In addition, this court certifies pursuant to 28

U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith. <u>Coppedge v. United States</u>,

369 U.S. 438, 444-445 (1962). The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

Allyne R. Ross
United States District Judge

Dated:        September 20, 2012
              Brooklyn, New York

32